939 F.2d 954
 GREATER ORLANDO AVIATION AUTHORITY, Petitioner,
v.
FEDERAL AVIATION ADMINISTRATION, Respondent,
Guy Gannett Publishing Co. d/b/a Radio Station WMNZ (AM),
Intervenor-Respondent.
GREATER ORLANDO AVIATION AUTHORITY, Petitioner-Appellant,
v.
FEDERAL AVIATION ADMINISTRATION, Respondent-Appellee,
Guy Gannett Publishing Co. d/b/a Radio Station WWNZ (AM),
Intervenor-Respondent.
 Nos. 90-3081, 90-3082.
 United States Court of Appeals,
Eleventh Circuit.
 Aug. 23, 1991.
 
 Egerton K. van den Berg, Foley & Lardner, Ellen S. Camenker, Orlando, Fla., for petitioner-appellant.
 Edward W. Hummers, Jr., Fletcher, Heald & Hildreth, Mania Kleinburd Baghdadi, Washington, D.C., for intervenor Guy Gannett.
 James B. Busey, IV, F.A.A., Patricia R. Lane, F.A.A., Asst. Gen. Counsel, Samuel K. Skinner, Sec. of Transp., Washington, D.C., Douglas MacNair, Airspace/Aviations Standards Dept., Frederick, Md., Jack Johnson, Manager, Aviation Office, Fla. Dept. of Transp., Tallahassee, Fla., for respondent-appellee.
 Petition for Review of Order of the Federal Aviation Administration.
 Before ANDERSON and DUBINA, Circuit Judges, and GIBSON*, Senior Circuit Judge.
 DUBINA, Circuit Judge:
 
 
 1
 Petitioner, Greater Orlando Aviation Authority ("Aviation Authority"), petitions this court to review two Federal Aviation Administration ("FAA") decisions which have allowed Guy Gannett Publishing Co. ("Gannett") to erect radio towers in the Orlando, Florida, area. The two issues presented in this appeal are (1) whether this court has subject matter jurisdiction to review the FAA decisions; and (2) whether the FAA's decision not to consider a proposed airport, while it was considering the impact of Gannett's radio towers on air safety, was arbitrary and capricious. We find that the Aviation Authority showed reasonable grounds for its failure to file a timely appeal from the September 21, 1989, determination, but we further find that we do not have jurisdiction over the appeal from the December 5, 1989, determination. In addition, we find that the FAA's decision not to consider the proposed airport was arbitrary and capricious. Accordingly, we grant the Aviation Authority leave to appeal from the FAA's September 21, 1989, determination; we dismiss the Aviation Authority's appeal from the December 5, 1989, determination for lack of subject matter jurisdiction; and we vacate and remand the September 21, 1989, determination.
 
 I. BACKGROUND
 
 2
 The Aviation Authority is a public entity created to develop, finance, and operate airport facilities in Orange County, Florida. As part of that responsibility, the Aviation Authority undertook an airport capacity study to measure and anticipate general aviation needs in Orange County. The study indicated that Orlando, Florida, is in need of reliever airports.[1] The Aviation Authority then developed a preliminary list of twelve sites for two possible reliever airports (six sites for one airport in the east and six sites for another airport in the west). The FAA worked in concert with the Authority in developing plans for reliever airports in the Orlando area. The FAA's involvement included meeting with representatives of the Aviation Authority to discuss locations, required airport capacity, and environmental concerns.[2]
 
 
 3
 On April 24, 1989, the FAA received a Notice of Proposed Construction or Alteration submitted by Gannett that proposed the construction of a six-tower antennae complex in the Orlando area.[3] The FAA determined that the proposed towers would be considered an obstruction under standards set out in Objects Affecting Navigable Airspace, 14 C.F.R. Sec. 77 (1991), and that the agency would need to conduct an aeronautical study to determine whether the towers would be a hazard to air navigation.[4] On July 6, 1989, the FAA circulated notice of the aeronautical study of Gannett's proposed towers requesting all interested parties to submit comments on the proposal by August 5, 1989.[5]
 
 
 4
 The FAA negotiated with Gannett in order to reduce the height of the towers, so that they would not be considered an obstruction under Sec. 77.[6] These negotiations were successful,[7] but unfortunately, due to a clerical mistake, an incorrect Acknowledgment of Notice of Proposed Construction or Alteration concerning Gannett's proposed towers was mailed by the FAA on September 15, 1989. A week later, on September 21, 1989, a correct version was mailed stating that the proposed towers would not be an obstruction under Sec. 77 standards.
 
 
 5
 Meanwhile, on June 6, 1989, the Aviation Authority officially informed the FAA of the exact location and coordinates of a proposed reliever airport.[8] The FAA has a standard rule of considering all proposals on a first-come, first-served basis.[9] Because notice of Gannett's proposal was received by the FAA prior to the receipt of the notice of the Aviation Authority, the FAA followed its standard procedures and did not consider the Aviation Authority's proposed airport when it was evaluating the proposed radio towers.
 
 
 6
 The Aviation Authority filed a request for discretionary review of the FAA's September 21, 1989, action on October 3, 1989.[10] The FAA denied this review on December 5, 1989, because administrative appellate procedures do not apply to determinations that the structure would not be an obstruction.[11]
 
 
 7
 Gannett then filed an application for site plan approval with the Lake County Site Plan Committee. The plan was approved subject to proof that the FAA had determined that the proposal would not be an obstruction under its rules. Gannett presented the requisite proof and obtained building permits to construct its antenna towers. The Aviation Authority filed a notice of appeal with the Board of County Commissioners[12] seeking review of the Lake County Building Department's issuance of the building permits. Simultaneously, the state circuit court granted the Aviation Authority an injunction to stop the construction for the purpose of allowing the matter to proceed before the Board of Commissioners. The Aviation Authority was unsuccessful before the Board of Commissioners and Gannett then moved to lift the injunction.[13] The injunction was dissolved and Gannett began erection of the towers.[14]
 
 
 8
 The Aviation Authority then filed two appeals with this court: (1) leave to file a Petition for Review of the September 21, 1989, determination (No. 90-3082), which held that Gannett's proposed towers were not an obstruction; and (2) a Petition for Review of the December 5, 1989, decision (No. 90-3081), which held that the September 21 determination was not subject to administrative review.
 
 II. STANDARD OF REVIEW
 
 9
 Under 49 U.S.C.App. Sec. 1486(e) (1988), "findings of fact" by the FAA "if supported by substantial evidence, shall be conclusive." In reviewing administrative fact-findings to determine whether they are supported by substantial evidence, this court must look at the record in its entirety, including the body of evidence opposed to the FAA's view. City of Pompano Beach v. FAA, 774 F.2d 1529, 1539 (11th Cir.1985). Not only must the agency's factual findings be supported by substantial evidence, but the agency's interpretation of the governing statute, application of the statute to the facts, and conclusion must be reasonable and not arbitrary or capricious. Id. at 1540.
 
 
 10
 Although this court is the final authority on issues of statutory construction, it must respect the agency's findings and conclusions when the question involves an interpretation of a statute that is within the agency's specialized knowledge and expertise. Id. This court "will adhere to the 'principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong.' " Veterans Administration Medical Center, Tampa Fla. v. Federal Labor Relations Authority, 675 F.2d 260, 262 (11th Cir.1982) (citations omitted).
 
 III. ANALYSIS
 A. Jurisdiction
 
 11
 Title 49 U.S.C.App. Sec. 1486(a) (1988), provides that a petition for review of an order of the Administrator of the FAA may be filed within sixty days after the entry of such order. After the expiration of the sixty days, the petition may be filed only by leave of the court upon a showing of reasonable grounds for failure to file within the allowed time period.[15] The Supreme Court has emphasized that the timely filing of a notice of appeal is " 'mandatory and jurisdictional.' " Houston v. Lack, 487 U.S. 266, 282, 108 S.Ct. 2379, 2388, 101 L.Ed.2d 245 (1988) (Scalia, J., dissenting) (quoting Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58, 61, 103 S.Ct. 400, 402, 403, 74 L.Ed.2d 225 (1982)); see also Pinion v. Dow Chemical, U.S.A., 928 F.2d 1522, 1525 (11th Cir.1991).
 
 
 12
 Since the Aviation Authority filed its appeal on January 31, 1990, the appeal was clearly filed more than sixty days after the FAA's September 21, 1989, determination. The phrase " '[a]ny order, affirmative or negative' has been judicially restricted to encompass only final FAA orders." Aeromar, C. Por A. v. Department of Transp., 767 F.2d 1491, 1492 (11th Cir.), reh'g denied, 773 F.2d 1239 (1985). The Aviation Authority argues that because it asked the FAA to reconsider its decision, the order was not final.[16] The Aviation Authority cites to language in Aeromar which reads, "[a]fter the filing of a petition for reconsideration of a FAA order, there is no 'definitive statement on the subject matter' of the order until the petition is denied." Id. at 1493 (quoting Outland v. C.A.B., 284 F.2d 224, 227 (D.C.Cir.1960)). The court stated that to hold otherwise would leave the court open to the possibility of unnecessary piecemeal judicial review. Id.
 
 
 13
 This case, however, is different from Aeromar. In this case, the FAA's determination was not subject to reconsideration. The FAA made a finding of no obstruction under 14 C.F.R. Sec. 77.19(c)(1), and that finding is not subject to discretionary review under Sec. 77.37. Thus, since the order was not subject to reconsideration, the order became final on September 21, 1989. Because the Aviation Authority did not appeal the order within sixty days of its becoming a final order, this court does not have jurisdiction over this appeal unless the Aviation Authority presents reasonable grounds for its failure to file within the statutory period.
 
 
 14
 The Aviation Authority gives two reasons why it did not timely appeal. First, it argues that it was pursuing state court remedies. The local Zoning Board, however, has no authority to affect the FAA's determination. Further, the local remedies involve an area of law over which the FAA does not have jurisdiction, namely, local zoning. The Aviation Authority argues that if it had been successful in state court, this review would have been unnecessary. Yet, no action by the Board of Commissioners could have affected the FAA's determination. Additionally, the Aviation Authority could have filed both appeals concurrently, instead of pursuing state court remedies while jurisdiction was being lost on the FAA determination.
 
 
 15
 Second, the Aviation Authority argues that it was attempting to persuade the FAA to reconsider its original decision. As discussed previously, however, FAA rules do not allow for reconsideration of a finding that a structure is not an obstruction. The Aviation Authority simply made a mistake in its interpretation of the FAA's procedures.[17] While ignorance is not typically excusable, it is understandable in this case, when one considers the confusion surrounding the FAA's determination of no obstruction. The FAA originally released an Acknowledgment of Notice of Proposed Construction or Alteration concerning Gannett's towers which stated that the towers would be a hazard.[18] A week later, the FAA released the correct version which stated that the towers would not be an obstruction. The FAA also sent out a letter saying that "[t]he Determination of No Hazard, issued by Southern Region under aeronautical study 89-ASO-799-OE, was therefore issued in accordance with agency policy and procedures."[19] Since a finding of a hazard or a finding of no hazard under an aeronautical study would be reviewable, these mailings by the FAA introduced confusion as to whether the FAA's determination was reviewable. This confusion likely caused the Aviation Authority to ask for review of the September 21 determination. As such, we are persuaded that this confusion presents reasonable grounds to explain why the Aviation Authority may have waited until after the denial of review before filing its notice of appeal.
 
 
 16
 With regard to the appeal from the FAA's denial of review dated December 5, 1989, the Aviation Authority did file its appeal within sixty days of the action. Nonetheless, this action is not reviewable. The Supreme Court in I.C.C. v. Brotherhood of Locomotive Engineers, 482 U.S. 270, 278-79, 107 S.Ct. 2360, 2365-66, 96 L.Ed.2d 222 (1987), held that a petition to reopen and reconsider an agency order which does not allege new evidence or changed circumstances is not subject to judicial review. The Aviation Authority's request for review alleged neither new evidence nor changed circumstances. Thus, the FAA's denial of review dated December 5, 1989, is not subject to appellate review.
 
 B. Violation
 
 17
 The FAA contends that it was not required to consider West Site One (the site of the Aviation Authority's proposed airport) when deciding whether Gannett's towers would be hazardous to air safety. The FAA argues that it works on a first-come, first-served basis. Gannett provided notice of the towers on April 24, 1989, but the FAA did not have actual notice of the proposed airport until June 6, 1989. In addressing this issue, the Eighth Circuit in White Industries v. F.A.A., 692 F.2d 532 (8th Cir.1982), stated as follows:
 
 
 18
 [The actual notice] interpretation of the regulation is unduly technical and restrictive and is contrary to the policy underlying the statute and regulations. The Federal Aviation Act authorizes the Administrator to develop regulations to insure the safe and efficient use of airspace, 49 U.S.C. Sec. 1348, and to provide adequate public notice of any proposed structure where notice will promote air safety. 49 U.S.C. Sec. 1501. The regulations at issue were promulgated to effectuate this congressional mandate.
 
 
 19
 The FAA's interpretation of the regulation would frustrate this statutory policy.
 
 
 20
 692 F.2d at 535.
 
 
 21
 We agree with the Eighth Circuit's ruling in White that the regulations must be interpreted to require the FAA to consider the effect of the construction upon planned airports of which the FAA has "actual, informal notice." In the present case, the question remains, as it did in White, when did the FAA receive actual, informal notice of the proposed airport?[20] This question cannot be answered until the FAA holds an evidentiary hearing to determine when it received "actual, informal notice."[21]
 
 
 22
 The FAA maintains that White is distinguishable from this case. White involved an appeal from an FAA determination that certain proposed towers would not be a hazard to air navigation. Representatives of a local airport under construction brought an action asserting that the FAA ignored the existence of the airport as well as the comments filed on behalf of the airport when considering a determination of hazard/no-hazard for the proposed radio towers.
 
 
 23
 First, the FAA argues that actual construction of the airport in White had started two years prior to the time the proposals for the towers and the subject airport were filed, thus, giving the FAA actual knowledge of the airport prior to the filing of the tower proposal. In the present case, not only had construction not started, but the Aviation Authority was still considering at least five other sites. While the facts of the two cases are not identical, the reasoning is the same: requiring formal actual notice "is unduly technical and restrictive and is contrary to the policy underlying the statute and regulations." Id.
 
 
 24
 Second, the FAA argues that in White, the FAA did not consider the comments filed by the airport, whereas in the present case the FAA claims that it accepted and considered the comments filed by the Aviation Authority before deciding whether the towers would present a hazard. The FAA presents no evidence that the Aviation Authority's comments were considered, and the record indicates otherwise. The Aviation Authority's comments appertained to the proposed airport, yet the FAA on every occasion recounted that the proposed airport was not considered when Gannett's tower proposal was appraised.[22] It is difficult for us to imagine how the FAA could have considered the Aviation Authority's comments if it did not consider the subject matter of those comments. Furthermore, White requires the FAA to do more than just pay lip service to the Aviation Authority's comments. The FAA is required to consider the effect of the construction upon the proposed airport.
 
 
 25
 There is, however, one important distinguishable characteristic of White which moots the question of when the FAA received "actual, informal notice" of the proposed airport. Contained in the language of White is a determination that the first-come, first-served procedure employed by the FAA is arbitrary and capricious and is counter to the FAA's purpose of promoting safe and efficient use of airspace.[23] The court in White held that if the FAA receives actual notice of the proposed airport after it receives notice of the proposed towers, the FAA must consider the planned airport. The limitation on this consideration is that the FAA must have notice of the second structure before the end of the time allocated to receive comments on the proposed hazard. In the present case the deadline for comments was August 5, 1989, and the FAA had actual formal notice on June 6, 1989.
 
 
 26
 The holding in White that the first-come, first-served method is contrary to the FAA's purpose of promoting safe and efficient use of airspace is strengthened by the legislative history for the 1987 amendments to 49 U.S.C. App. Sec. 1501 (1988).[24] Under the 1987 amendments, Congress has required notice of construction or alteration of a structure whenever "notice will promote safety in air commerce as well as the efficient use and preservation of the navigable airspace...." 49 U.S.C.App. Sec. 1501(a) (1988) (emphasis added).
 
 
 27
 The purpose of this amendment is to "make[ ] clear the FAA's responsibility to carry out obstruction evaluations and notifications in light of the proposed structure's impact on aviation safety and on efficient use and preservation of airspace and airport capacity." H.R.Rep. No. 484, 100th Cong., 1st Sess. 85, reprinted at 1987 U.S.Code Cong. & Admin. News 2533, 2630, 2660.[25] For the FAA to determine what would be the most efficient use of the airspace in the Orlando area, the FAA must consider both Gannett's towers and the proposed airport. If the FAA does not consider every proposal and every comment it receives during the comment period, it cannot make an accurate determination of the most efficient use of airspace.
 
 
 28
 The FAA argues that the first-come, first-served procedure is a rational approach to meeting its mandate of promoting the safe and efficient use of airspace and that it should not be required to weigh the value of one proposal over another. However, that is exactly what Congress intended, for as one senator stated, "[t]he amendment asserts that a balance should be struck between aviation and nonaviation use of the Nation's airspace." 133 Cong. Rec. S15264 (daily ed. October 28, 1987) (Statement of Sen. Chiles).[26] Accordingly, in light of the holding in White and the 1987 amendments to the Federal Aviation Act, this court agrees with the Eighth Circuit that the FAA's first filing rule is arbitrary and capricious. The rule does not meet the FAA's congressional mandate of promoting safe and efficient use and preservation of navigable airspace.
 
 IV. CONCLUSION
 
 29
 In conclusion, we GRANT the Aviation Authority leave to appeal the FAA's September 21, 1989, determination that a radio antenna complex for station WWNZ is not an obstruction under 14 C.F.R. Sec. 77.23; we VACATE the FAA's September 21, 1989, determination and REMAND this cause to the FAA with instructions to reevaluate Gannett's proposal, in light of the Aviation Authority's proposed airport, and to make a determination that "will promote safety in air commerce as well as the efficient use and preservation of the navigable airspace and of airport traffic capacity at public-use airports," 49 U.S.C.App. Sec. 1501(a) (1988); and we DISMISS appeal No. 90-3082, the December 5, 1989, FAA determination, on the basis that we lack subject matter jurisdiction to hear the appeal.
 
 
 30
 VACATED and REMANDED with directions.
 
 
 
 *
 Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [1]
 The FAA also indicated this need in the National Plan of Integrated Airport Systems, which it issued in March 1986. In 1987, several additional studies were done, including the Florida Aviation System Plan and the East Central Metropolitan Aviation System Plan, both of which identified a need for reliever airports in the Greater Orlando area
 
 
 [2]
 As early as October 2, 1987, the FAA had a file on this project. FAA officials attended several meetings regarding implementation of a site-specific study concerning reliever airports. In addition, FAA officials made specific recommendations for the locations of the reliever airports, as well as runway configurations
 
 
 [3]
 The purpose of the radio towers is to service WWNZ, a 50,000 watt AM radio station
 
 
 [4]
 14 C.F.R. Sec. 77 establishes standards for determining obstructions in navigable airspace and provides for aeronautical studies of obstructions to air navigation to determine their effect on the safe and efficient use of airspace
 
 
 [5]
 According to the record, the Aviation Authority did not receive the requisite notice
 
 
 [6]
 Gannett's antenna tower array was considered a hazard under Sec. 77.23(a)(3) which prohibits a structure with the following characteristics:
 A height within a terminal obstacle clearance area, including an initial approach segment, a departure area, and a circling approach area, which would result in the vertical distance between any point on the object and an established minimum instrument flight altitude within that area or segment to be less than required obstacle clearance.
 Gannett's tower array originally exceeded Sec. 77.23(a)(3) by 26 feet, which would have caused Orlando International Airport Radar Minimum Vectoring Altitude to increase from 1500 to 1700 feet above mean sea level ("AMSL").
 
 
 [7]
 The maximum height of Gannett's towers was lowered from 500 feet above ground level ("AGL") to 374 feet AGL
 
 
 [8]
 FAA regulations require any person who intends to build an airport to file FAA Form 7480-1, Notice of Landing Area Proposal, with the FAA at least 90 days before the work is to begin. 14 C.F.R. Sec. 157.3. The Aviation Authority filed this form with the FAA on June 6, 1989. The filing of this form by the Aviation Authority is what gave the FAA formal notice of the proposed airport
 
 
 [9]
 Sec. 77.21(a) states that the obstruction standards "apply to a planned facility or use, or a change in an existing facility or use, if a proposal therefor is on file with the Federal Aviation Administration or an appropriate military service on the date the notice required by Sec. 77.13(a) is filed."
 
 
 [10]
 Sec. 77.37 allows for discretionary review in some circumstances. It states as follows:
 The sponsor of any proposed construction or alteration or any person who stated a substantial aeronautical objection to it in an aeronautical study, or any person who has a substantial aeronautical objection to it but was not given an opportunity to state it, may petition the Administrator, within 30 days after issuance of the determination under Sec. 77.19 or Sec. 77.35 or revision or extension of the determination under Sec. 77.39(c), for a review of the determination, revision, or extension. This paragraph does not apply to any acknowledgement issued under Sec. 77.19(c)(1). (emphasis added).
 
 
 [11]
 The FAA's determination fell under Sec. 77.19(c)(1), which states that the construction or alteration does not qualify as an obstruction
 
 
 [12]
 At times in the briefs, the parties call the Board of Commissioners the Board of Adjustment. For the sake of convenience and clarity, this body will be called the Board of Commissioners throughout this opinion
 
 
 [13]
 Counsel for Gannett told the Board:
 One thing that can happen for sure about these towers is what goes up can come down ... the Greater Orlando Aviation Authority's attorney has indicated, that it doesn't matter what we do here today, what this Board does. They're going to pursue the FAA ... remedies.... If we put our towers up and we lose in those forums, we have got to take them down.
 
 
 [14]
 At this time all six towers are in position and functioning
 
 
 [15]
 Sec. 1486(a) states in full:
 Any order, affirmative or negative, issued by the Board or Secretary of Transportation under this chapter, except any order in respect of any foreign air carrier subject to the approval of the President as provided in section 1461 of this Appendix, shall be subject to review by the court of appeals of the United States or the United States Court of Appeals for the District of Columbia upon petition, filed within sixty days after the entry of such order, by any person disclosing a substantial interest in such order. After the expiration of said sixty days a petition may be filed only by leave of the court upon a showing of reasonable grounds for failure to file the petition theretofore.
 
 
 [16]
 Several courts have held that the existence of a reviewable administrative record is a determinative element in defining an FAA decision as an "order" for purposes of section 1486. See Sierra Club v. Skinner, 885 F.2d 591, 593 (9th Cir.1989); Suburban O'Hare Comm'n v. Dole, 787 F.2d 186, 193 (7th Cir.), cert. denied, 479 U.S. 847, 107 S.Ct. 169, 93 L.Ed.2d 106 (1986)
 While the Aviation Authority argues that there was not an adequate record, its argument is misguided. Specifically, the Aviation Authority argues that there is not an adequate record to show that Gannett's tower array is not a hazard. The Aviation Authority claims that the FAA must hold public hearings before a determination of no hazard is made from an aeronautical study. The FAA, however, did not make a finding of no hazard from an aeronautical study; rather, the FAA canceled the study after it determined that Gannett's towers would not be an obstruction under 14 C.F.R. Sec. 77.23.
 
 
 [17]
 This mistake may not have had an effect if the FAA had not waited until after the sixty-day appeal period expired before telling the Aviation Authority that the September 21, 1989, decision was not reviewable by the FAA
 
 
 [18]
 This was the acknowledgement that is dated September 15, 1989
 
 
 [19]
 Letter from the Manager of Flight Information and Obstruction, FAA, dated October 12, 1989. (R1-313)
 
 
 [20]
 There is certainly some evidence in the record that the FAA had "actual, informal notice" of the site of the proposed airport prior to receiving notice of Gannett's towers. On March 9, 1989, FAA officials from the Orlando Airport's District Office (the "Orlando ADO") attended a kickoff meeting with Aviation Authority staff and members of a consulting firm. During the meeting, the Aviation Authority identified the West Site One parcel and disclosed to the FAA that West Site One had been assigned the highest priority and that the Aviation Authority Board was being asked to approve $50,000 "at risk" money with respect to the Aviation Authority's offer to purchase the site
 The minutes of this meeting indicate that the Orlando ADO offered to act as a "conduit" between the Phase II Study consultant and other FAA offices. (R1-320-21) This is significant because an internal FAA memorandum states the following:
 The new and clarified procedures call for all operating divisions to review notices of proposed construction or alteration received by the FAA and not issue any acknowledgement and/or determination until all operating divisions agree that the proposal will not create a hazard. It should be emphasized that this conclusion must be reached even on a proposal that does not meet the Part 77 notice criteria. (R2-289)
 Therefore, it appears from the record that even though the Orlando ADO may have received informal notice of the proposed airport, it gave its approval for Gannett's towers without considering the proposed airport.
 
 
 [21]
 This court makes no finding as to whether attendance at the March 9, 1989, meeting put the FAA on notice as to the existence of West Site One. We merely note that this meeting could have put the FAA on notice
 
 
 [22]
 As an example, in a letter dated October 12, 1989, the FAA stated that "the proposed airport was not considered in the aeronautical study." (R1-313)
 
 
 [23]
 A brief review of the pertinent dates will best illustrate this point. In White the FAA received notice of the proposed construction of the radio towers on March 12, 1981. Interested persons then had until May 9 to provide comments. Formal notice of the proposed airport was not received until June 12. Yet, the court held that if the FAA on April 8 had actual notice (formal or informal), then the FAA was "required to notify petitioner of the aeronautical study and to consider its comments." Id. This consideration must include the effect of the construction upon the planned airport. Clearly, April 8 is nearly a month after the FAA received notice of the proposed radio towers
 
 
 [24]
 This section of the Code is entitled, "Hazards to safe and efficient air commerce and preservation of navigable airspace and airport traffic capacity."
 
 
 [25]
 The House report goes further to say that "[t]he FAA should coordinate such evaluations with state and local aviation officials." Id. Thus, the FAA should not have summarily dismissed the Aviation Authority's comments but rather should have coordinated its evaluation of Gannett's proposal with the Aviation Authority and other state and local aviation officials
 Additional reasoning behind the amendments is the following:
 [T]he problem is not only with existing airports and runways. Tall structures may block planned new airports and runways needed to meet growth in air traffic. That is a real, serious problem in States like Florida, where growth is unchecked and development is taking its toll on available property.
 
 
 [133]
 Cong.Rec. S15264 (daily ed. October 28, 1987) (Statement of Sen. Chiles)
 
 
 [26]
 This court in no way implies that the Aviation Authority's proposed airport is more important than Gannett's radio towers. No doubt there are factual scenarios under which each proposal would be the safest most efficient use of airspace. Rather, this court makes the point that the only way to determine what is the safest most efficient use of airspace is to consider all proposals and comments received during the comment period