USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-1133

 PENOBSCOT AIR SERVICES, LTD.,

 Petitioner,

 v.

 FEDERAL AVIATION ADMINISTRATION,

 Respondent.

 ON PETITION FOR REVIEW OF A FINAL DECISION AND ORDER OF

THE FEDERAL AVIATION ADMINISTRATION

 Before

 Boudin, Circuit Judge,
 
 Bownes, Senior Circuit Judge,
 
 and Lynch, Circuit Judge.
 
 

 Joseph D. Kuchta, with whom Kuchta & Brinker were on brief for
petitioner.

 John S. Koppel, Attorney, with whom Frank W. Hunger, Assistant
Attorney General, and Anthony J. Steinmeyer, Attorney, United
States Department of Justice, Civil Division, were on brief for
respondent.

January 19, 1999

 
 
 BOWNES, Senior Circuit Judge. This case comes to us on
a petition for review of a final decision of the Federal Aviation
Administration (FAA), pursuant to 49 U.S.C. 46110. Penobscot Air
Services, Inc. (Penobscot) filed with the FAA a complaint alleging
that the Knox County Board of Commissioners (Knox County), owner of
the Knox County Regional Airport, violated Penobscot's rights under
the Federal Aviation Act (the Act). Specifically, Penobscot
alleged that Knox County violated provisions of the Act that bar
unjust discrimination, see 49 U.S.C. 47107(a)(1), (5), and the
award of an "exclusive right," see 49 U.S.C. 40103(e). The
complaint also claimed that Penobscot was entitled to an
evidentiary hearing pursuant to 49 U.S.C. 46101, 46104. The FAA
rejected Penobscot's claims; we affirm.
 I
 BACKGROUND
 Penobscot is a tenant leasing space at Knox County
Regional Airport. It is a fixed-base operator (FBO) at the
airport, which means it provides "services similar to those that a
service station provides for those who operate automobiles." City
of Pompano Beach v. F.A.A., 774 F.2d 1529, 1532 n.5 (11th Cir.
1985) (internal quotation marks omitted). It also provides air
charter service. 
 Penobscot filed a formal complaint at the FAA in 1997,
charging that Knox County had violated Penobscot's rights under the
Federal Aviation Act. Specifically, Penobscot alleged that Knox
County had violated provisions of the Act and applicable grant
agreements in two ways: by charging Penobscot higher rent than
another FBO (Downeast Airlines) that leased space at the airport;
and by prohibiting Penobscot from conducting its aircraft repair
business on the same terms as another company, Barnstorm Aviation,
because Knox County allegedly did not require Barnstorm to comply
with its minimum standards, as it required of Penobscot.
 The Director of the FAA Office of Airport Safety and
Standards evaluated Penobscot's complaint, the answer filed by Knox
County, and the documentary evidence submitted by the parties, and
issued a decision dismissing all of Penobscot's claims. The 28-
page Record of Decision (ROD) analyzed the issues and concluded
that Knox County did not violate its federal obligations. The ROD
also found that Penobscot was not entitled to an evidentiary
hearing in this case.
 Penobscot administratively appealed the FAA's initial
agency decision, reiterating the same arguments. The FAA Associate
Administrator for Airports issued the agency's final decision
affirming the ROD. This appeal followed.
 II
 Standard of Review
 The applicable standard of review for FAA action is
provided by the Federal Aviation Act and, by default, the
Administrative Procedure Act (APA), 5 U.S.C. 706 (1994). SeePublic Citizen, Inc. v. F.A.A., 988 F.2d 186, 196 (D.C. Cir. 1993). 
These statutes require us to apply different standards of review
depending upon what type of determination we are reviewing. 
 A. The FAA's Factual Findings
 Under the Federal Aviation Act (the Act), we review the
FAA's findings of fact to determine whether they are "supported by
substantial evidence." 49 U.S.C. 46110(c) (1994). Findings of
fact that are so supported are "conclusive" and may not be
disturbed on appeal. Id. 
 As the Court has explained in the context of the APA,
substantial evidence review is conducted on the record considered
as a whole. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488
(1951); see Greater Orlando Aviation Auth. v. F.A.A., 939 F.2d 954,
958 (11th Cir. 1991). Substantial evidence is "such relevant
evidence as a reasonable mind might accept as adequate to support
a conclusion." Universal Camera, 340 U.S. at 477 (internal
quotation marks omitted), quoted in American Textile Mfrs. Inst. v.
Donovan, 452 U.S. 490, 522 (1981) (ATMI); see also F.T.C. v.
Indiana Fed'n of Dentists, 476 U.S. 447, 454 (1986). The reviewing
court must take into account contradictory evidence in the record. 
Universal Camera, 340 U.S. at 487-88 (The reviewing court must
consider "the record in its entirety . . ., including the body of
evidence opposed to the [agency's] view."); see Greater Orlando
Aviation Auth., 939 F.2d at 958. But "the possibility of drawing
two inconsistent conclusions from the evidence does not prevent an
administrative agency's finding from being supported by substantial
evidence." ATMI, 452 U.S. at 523 (internal quotation marks
omitted).
 In Allentown Mack Sales & Serv., Inc. v. N.L.R.B., 118 S.
Ct. 818, 823 (1998), the Court equated the substantial evidence
standard with "whether on this record it would have been possible
for a reasonable jury to reach the [agency's] conclusion." The
"substantial evidence" test "gives the agency the benefit of the
doubt, since it requires not the degree of evidence which satisfies
the court that the requisite fact exists, but merely the degree
that could satisfy a reasonable factfinder." Id. at 828. This is
an "objective test," id., so, for example when the agency "purports
to be engaged in simple factfinding, . . . it is not free to
prescribe what inferences from the evidence it will accept and
reject, but must draw all those inferences that the evidence fairly
demands," id. at 829; see Indiana Fed'n of Dentists, 476 U.S. at
454. The agency's findings "must . . . be set aside when the
record before a Court of Appeals clearly precludes the [agency's]
decision from being justified by a fair estimate of the worth of
the testimony of witnesses or its informed judgment on matters
within its special competence or both." Universal Camera, 340 U.S.
at 490. 
 B. The agency's decisions on legal issues.
 In view of Section 46110's silence as to the standard for
reviewing nonfactual matters, the standard of review for such
matters is provided by section 10(e) of the Administrative
Procedure Act. Public Citizen, 988 F.2d at 196. 
 Errors of law are reviewed by the court de novo. See 5
U.S.C. 706 ("[T]he reviewing court shall decide all relevant
questions of law."); Bureau of Alcohol, Tobacco and Firearms v.
Federal Labor Relations Auth., 464 U.S. 89, 97 n.7 (1983); Duboisv. United States Dep't of Agric., 102 F.3d 1273, 1284 (1st Cir.
1996); Howard v. F.A.A., 17 F.3d 1213, 1215 (9th Cir. 1994). "The
legal issues presented that is, the identification of governing
legal standards and their application to the facts found are, by
contrast [to factual findings], for the courts to resolve, although
even in considering such issues the courts are to give some
deference to the [agency's] informed judgment" in applying
statutory terms if the statute is silent or ambiguous on the issue. 
Indiana Fed'n of Dentists, 476 U.S. at 454.
 That deference is described in the familiar two-step test
of Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,
467 U.S. 837, 842-44 (1984), which applies to the FAA as to other
agencies. "On a pure question of statutory construction, our first
job is to try to determine congressional intent, using 'traditional
tools of statutory construction.' If we can do so, then that
interpretation must be given effect, and [agency regulations] must
be fully consistent with it." N.L.R.B. v. United Food & Commercial
Workers' Union, Local 23, 484 U.S. 112, 123 (1987) (UFCW) (emphasis
added) (quoting I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 446-48
(1987)). Thus, if the legislative intent is clear, we do not defer
to the agency and we end the Chevron analysis at step one. SeeDuckworth v. Pratt & Whitney, Inc., 152 F.3d 1, 5-6 & n.6 (1st Cir.
1998).
 We reach the second step of Chevron if "the statute is
silent or ambiguous with respect to the specific issue"; then "the
question for the court is whether the agency's answer is based on
a permissible construction of the statute." UFCW, 484 U.S. at 123
(quoting Chevron, 467 U.S. at 843). "Under this principle, we have
traditionally accorded the [agency] deference with regard to its
interpretation of the [statute] as long as its interpretation is
rational and consistent with the statute." Id.
 Even where such deference is due, the agency's
"explication" of its reasoning must be "not inadequate, irrational
or arbitrary." Allentown Mack, 118 S. Ct. at 822 (internal
quotation marks omitted); see id. at 826 (The APA "establishes a
scheme of reasoned decisionmaking," under which "[n]ot only must an
agency's decreed result be within the scope of its lawful
authority, but the process by which it reaches that result must be
logical and rational.") (internal quotation marks omitted); Bureau
of Alcohol, Tobacco and Firearms, 464 U.S. at 97 (explaining that
reviewing court "must not rubber-stamp . . . administrative
decisions") (alteration in original). The reviewing court remains
"the final authority on issues of statutory construction." Pompano
Beach, 774 F.2d at 1540; see 5 U.S.C. 706(2)(A).
 C. Review of FAA's Other Action and Conclusions
 With respect to other agency action, findings, and
conclusions, the APA requires the reviewing court to hold them
unlawful and set them aside if they are found to be "arbitrary,
capricious, an abuse of discretion, or otherwise not in accordance
with law." 5 U.S.C. 706(2)(A). 
 The task of a court reviewing agency action under the
APA's "arbitrary and capricious" standard is to determine whether
the agency has examined the pertinent evidence, considered the
relevant factors, and "articulate[d] a satisfactory explanation for
its action including a 'rational connection between the facts found
and the choice made.'" Motor Vehicle Mfrs. Ass'n v. State Farm
Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (quoting Burlington
Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962)); seeBaltimore Gas & Elec. Co. v. Natural Resources Defense Council,
Inc., 462 U.S. 87, 105 (1983) (citations omitted). 
 The reviewing court must "look to see if the agency
decision, in the context of the record, is too unreasonable (given
its statutory and factual context) for the law to permit it to
stand." Sierra Club v. Marsh, 976 F.2d 763, 769 (1st Cir, 1992)
(internal quotation marks omitted). 
 In State Farm, the Supreme Court offered several examples
of circumstances in which an agency action "normally" would be
considered arbitrary and capricious: situations where "the agency
has relied on factors which Congress has not intended it to
consider, entirely failed to consider an important aspect of the
problem, offered an explanation for its decision that runs counter
to the evidence before the agency, or is so implausible that it
could not be ascribed to a difference in view or the product of
agency expertise." State Farm, 463 U.S. at 43. "These are merely
'examples,' Puerto Rico Sun Oil Co. v. United States E.P.A., 8 F.3d
73, 77 (1st Cir. 1993); others could be recited as well." Dubois,
102 F.3d at 1285. "The reviewing court should not attempt itself
to make up for such deficiencies; we may not supply a reasoned
basis for the agency's action that the agency itself has not
given." State Farm, 463 U.S. at 43 (citing S.E.C. v. Chenery
Corp., 332 U.S. 194, 196 (1947)).
 "While this is a highly deferential standard of review,
it is not a rubber stamp." Dubois, 102 F.3d at 1285 (quoting
Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n,
59 F.3d 284, 290 (1st Cir. 1995)). Although "the ultimate standard
of review is a narrow one," the court must undertake "a thorough,
probing, in-depth review" and a "searching and careful" inquiry
into the record. Citizens to Preserve Overton Park, Inc. v. Volpe,
401 U.S. 402, 415-16 (1971). In order for an agency decision to
pass muster under the APA's "arbitrary and capricious" test, the
reviewing court must determine that the decision is "rational,"
Citizens Awareness Network, 59 F.3d at 290, that it "make[s] . . .
sense," Puerto Rico Sun Oil, 8 F.3d at 77. Only by "carefully
reviewing the record and satisfying [itself] that the agency has
made a reasoned decision" can the court "ensure that agency
decisions are founded on a reasoned evaluation of the relevant
factors." Marsh, 490 U.S. at 378 (internal quotation marks
omitted).
 III
 Was An Evidentiary Hearing Required?
 Before reaching the merits, Penobscot presses a threshold
question regarding process. Penobscot argues that it was entitled
to a formal evidentiary hearing, basing this contention on the Act
and on the due process clause of the Fourteenth Amendment. We
reject both contentions.
 A
 Penobscot argues that the FAA is obligated to hold a
formal hearing by virtue of 49 U.S.C. 46101(a) (1994) and the
agency's regulations. Neither the statutory scheme nor the FAA's
regulations require the agency to grant an evidentiary hearing to
Penobscot. Cf. 1 K. Davis & R. Pierce, Administrative Law Treatise379 (3d ed. 1994) (noting that APA 554(a) requires an agency to
afford a formal trial-type hearing only in an "adjudication
required by statute to be determined on the record after
opportunity for an agency hearing"; if statute does not so require,
then party is entitled only to the limited procedures in APA
 555); see also Pension Benefit Guaranty Corp. v. LTV Corp., 496
U.S. 633, 655-56 (1990). The statute provides that, when a person
files a complaint about a person violating the Act or a requirement
prescribed thereunder, the agency "shall investigate the complaint
if a reasonable ground appears to the [agency] for the
investigation." 49 U.S.C. 46101(a)(1). The plain meaning of
this language is that the agency first makes a determination, based
on the complaint, as to whether there is "a reasonable ground" for
investigating its merits, and if there is, then the agency is
mandated to investigate. 
 The statute further provides that the agency "may dismiss
a complaint without a hearing when the [agency] is of the opinion
that the complaint does not state facts that warrant an
investigation or action." 49 U.S.C. 46101(a)(3). On the other
hand, "if the [agency] finds in an investigation under this
subsection that a person is violating this part" of the Act, then
"[a]fter notice and an opportunity for a hearing . . ., the
[agency] shall issue an order to compel compliance." 49 U.S.C.
 46101(a)(4). We read subsection 46101(a)(3), in context, as
permitting the agency to dismiss a complaint without a hearing
either when the complaint on its face fails to state facts that
warrant any investigation at all, or when, after appropriate
investigation, the agency determines that no further investigation
is necessary and that no action is warranted on the allegations
raised in the complaint.
 Penobscot would have us require the agency to hold an
evidentiary hearing if the complaint alleges facts sufficient to
make out a prima facie claim that the statute has been violated,
even if the agency's investigation finds such allegations
unsupported by the facts. Penobscot offers no support for this
proposition, and we do not read the statute to so require. See 
Flying Tiger Line, Inc. v. Civil Aeronautics Bd., 350 F.2d 462, 465
(D.C. Cir. 1965); Flight Eng'rs Int'l Ass'n v. Civil Aeronautics
Bd., 332 F.2d 312, 314 (D.C. Cir. 1964).
 To the extent there is any ambiguity in the Act, i.e., in
Section 46101, it is resolved by the FAA regulations effectuating
the statute, which are entitled to Chevron deference. Those
regulations apply the procedural structure of 49 U.S.C. 46101 to
complaints filed with the agency alleging violations by airports of
the Act or any other statute within the jurisdiction of the agency. 
See 14 C.F.R. pt. 16 (1998). The regulations require the complaint
and all successive pleadings to provide a "complete statement of
the facts relied upon to substantiate each allegation" or
"averment[] made," 14 C.F.R. 16.23(b)(3) and (i), and require the
parties to supply all "supporting documentation upon which [they]
rely," 14 C.F.R. 16.23(g). "Each party shall file documents that
it considers sufficient to present all relevant facts and argument
necessary for the FAA to determine whether the sponsor is in
compliance." 14 C.F.R. 16.29(b)(1).
 Moreover, "[i]n rendering its initial determination, the
FAA may rely entirely on the complaint and the responsive pleadings
provided under [the] subpart" applicable to complaints. Id.; see
also id. at 16.29(b) (Whether the FAA's investigation includes
more than that set forth in 16.29(b)(1) is within "the sole
discretion of the FAA."); id. at 16.109(a) ("In cases in which a
hearing is not required by statute, the FAA may provide opportunity
for a hearing at its discretion.").
 A hearing is required under the regulations only if the
initial determination "finds the respondent in noncompliance and
proposes the issuance of a compliance order." 14 C.F.R.
 16.31(d). This is consistent with the statute, which speaks of
an "opportunity for a hearing" only if the agency finds a violation
and is considering issuing an order to compel compliance. See 49
U.S.C. 46101(a)(4). Because the FAA's regulations constitute a
permissible interpretation of the statute, they are entitled to
deference. See Chevron, 467 U.S. at 843.
 Penobscot points to provisions in the statute and the
regulations setting forth procedures for conducting hearings in
those cases where the agency holds a hearing. See 49 U.S.C.
 46104 (1994); 14 C.F.R. 16.201-16.237. But, as discussed
supra, neither the statute nor the regulations contain a provision
requiring a formal hearing whenever a complaint is filed; they
simply require one if a finding of noncompliance is made, which, of
course, is not the case here. The procedural provisions Penobscot
cites do not vitiate the agency's discretion in determining, after
investigation, that a particular complaint does not warrant a
formal hearing. See 49 U.S.C. 46101; 14 C.F.R. 16.29(b). The
cited procedural provisions simply set forth the procedures that
the agency must apply whenever it does hold a hearing. It simply
does not logically follow that an agency must hold a hearing in
every case, merely because the agency sets forth provisions for
procedures it will apply in those situations where it does decide
that a hearing would be appropriate.
 Finally, but certainly not least importantly, we note
that an agency is permitted broad leeway in interpreting its own
rules, as long as those interpretations are reasonable. See Martinv. Occupational Safety & Health Rev. Comm'n, 499 U.S. 144, 150-51
(1991) (explaining that an "agency's construction of its own
regulations is entitled to substantial deference" unless an
inconsistent statutory meaning is "free from doubt"). And the
agency here has interpreted its rules as not requiring an
evidentiary hearing, which is consistent with its interpretation of
the statute.
 To counteract the force of the clear statutory and
regulatory language, Penobscot relies on dictum in Kemmons Wilson,
Inc. v. F.A.A., 882 F. 2d 1041 (6th Cir. 1989). There, the FAA had
found that the Memphis-Shelby County Airport Authority had not
violated the "exclusive right" provision of the Act. The Sixth
Circuit reversed because the record contained no evidence
supporting the FAA's conclusions. The agency had failed "to
analyze the issues presented and to make specific reviewable
findings of fact and conclusions." Id. at 1047. The court then
made the statement that 49 U.S.C. App. 1482(a), which is now
codified at 49 U.S.C. 46101(a), "contemplates a 'hearing' if the
complaint states 'a prima facie case.'" Kemmons Wilson, 882 F.2d
at 1047.
 We are not bound by the Sixth Circuit's dictum and we
decline to follow it. As we have already explained, to require
such a hearing would contradict the statute's statement that the
agency may dispense with a hearing where it is of the opinion that
the facts warrant no further action. It would also ignore the
FAA's authoritative contrary interpretation of the statute,
embodied in the agency's regulations. We defer to the agency's
interpretation because it is "rational" and "based on a permissible
construction of the statute." UFCW, 484 U.S. at 123 (quoting
Chevron, 467 U.S. at 843). Finally, Kemmons Wilson is
distinguishable from the present case. There, the court ordered
the FAA to hold a formal hearing because the court found the
agency's investigation and its analysis inadequate. Here, in
contrast, the FAA has fully investigated Penobscot's complaint and
evaluated its merits prior to reaching its conclusion that it
should be dismissed.
 B
 Nor does the due process clause of the Constitution
require an evidentiary hearing on Penobscot's formal complaint. 
Penobscot argues that, as a tenant at Knox County airport, it is a
beneficiary of the restrictive covenant in the airport's deed
prohibiting unjust discrimination and grants of exclusive rights. 
As such, Penobscot claims a due process right to an evidentiary
hearing before the FAA deprives it of its asserted property
interest in enforcement of the restrictive covenant. 
 The due process clause is implicated where a party is
deprived of a liberty or property interest, as defined by an
independent source such as state law, to which he has "a legitimate
claim of entitlement." Board of Regents v. Roth, 408 U.S. 564, 577
(1972); see Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538
(1985). The FAA cannot deprive a party of constitutionally
protected property without appropriate procedural safeguards. 
Loudermill, 470 U.S. at 541 (internal quotation marks omitted). 
 The FAA argues that Penobscot's beneficial interest in
the restrictive covenant is not a property interest such as would
give rise to due process rights, because Penobscot has no
"entitlement" to the result it seeks. See Roth, 408 U.S. at 577. 
If it did, the FAA asserts, "then any statute imposing a mandatory
regulatory duty on an agency would enable any person benefited by
the regulation to assert a due process 'entitlement' that the
agency do its job, and to insist on constitutional process in
connection with every decision the agency made. . . . [T]he
situation is akin to that posed in the general law enforcement
context, where it is well settled that a citizen has no due process
claim to law enforcement." Resp't Br. at 27-28 (citing DeShaney v.
Winnebago County Dep't of Social Servs., 489 U.S. 189 (1989)). We
need not decide whether Penobscot's property interest is sufficient
to trigger the due process clause, because we hold, in any event,
that even if it did, due process would not obligate the agency to
hold a hearing on Penobscot's complaint.
 The due process clause is "'flexible and calls for such
procedural protections as the particular situation demands.'" 
Mathews v. Eldridge, 424 U.S. 319, 334 (1976) (quoting Morrissey v.
Brewer, 408 U.S. 471, 481 (1972)). In deciding how much process is
due in any given situation, courts weigh "three distinct factors": 
(1) "the private interest [i.e., Penobscot's] that will be affected
by the official action"; (2) "the risk of an erroneous deprivation
of such interest through the procedures used, and the probable
value, if any, of additional or substitute procedural safeguards";
and (3) the government's interest, including "the fiscal and
administrative burdens" posed by alternative procedural
requirements. Eldridge, 424 U.S. at 335.
 The balance of these factors weighs in favor of the FAA. 
The first factor carries weak, if any, weight for Penobscot, whose
interest is rather attenuated. The primary property interest in
the restrictive covenant is held by the United States, to whom the
land shall revert upon breach of the covenant. Penobscot
essentially benefits from the covenant as any member of the public
benefits from the requirement of non-exclusive access to the
airport. Penobscot stands to earn a certain amount of profits if
the requirement is enforced, while members of the public, as
consumers, would benefit from purchasing airport services at lower
prices from more efficient companies. 
 In addition, Penobscot's interest must be discounted to
the extent that it is asserting a right to free itself of its
voluntarily negotiated contract rents. Such an improvement in its
commercial competitive position does not hold much weight in the
Eldridge balancing, especially since Penobscot does not have a
legally created entitlement to the result it seeks. See infra [at
26-27,] ___ F.3d at ___. 
 In short, Penobscot's interest pales in comparison with
the interests at issue in the cases it cites in its brief. See,
e.g., United States v. James Daniel Good Real Property, 510 U.S. 43
(1993) (ex parte seizure of property owner's home pending
forfeiture proceeding); Connecticut v. Doehr, 501 U.S. 1 (1991)
(prejudgment attachment of real property without prior notice);
Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123 (1951)
(labeling organizations "subversive," affecting not only the
organizations themselves but also their members, including members'
rights to maintain federal jobs).
 The second Eldridge factor is also of scant aid to
Penobscot. There is no significant risk that the FAA's refusal to
hold a hearing erroneously deprived Penobscot of its attenuated
interest. The risk of error is particularly small in a case like
this, given the nature of the issues and type of evidence involved. 
See Eldridge, 424 U.S. at 335. Here, most of the historical facts
were essentially undisputed, and the FAA's decision, for the most
part, involved interpretation of statutes, regulations, and
policies, and applying them to the undisputed facts. No
credibility issues lend themselves to a face-to-face proceeding. 
Moreover, the FAA's investigation appears to have been thorough,
and its initial and final decisions fully discussed all issues
raised by Penobscot in its submissions to the agency. 
 Nor has Penobscot pointed to any appreciable benefit
likely to be derived from requiring an evidentiary hearing. It has
not demonstrated how an evidentiary hearing would yield either
evidence of a different nature or a different treatment of evidence
already gathered. Penobscot certainly cannot claim a right to
withhold certain evidence or arguments from the FAA's
investigators, waiting to spring them on the agency at a hearing.
 Penobscot treats this case as if the FAA had offered the
company absolutely no opportunity to present its side of the case. 
Indeed, Penobscot refers to the FAA's procedure here as "ex parte"
and cites cases that decry factfinding without offering the "person
in jeopardy of serious loss notice of the case against him and
opportunity to meet it." See McGrath, 341 U.S. at 171-72. 
Penobscot's argument is inapplicable to the present case. 
Penobscot did not lack notice of the issues the FAA was
investigating and, significantly, had every opportunity to submit
whatever evidence or argument it thought appropriate to support its
position. Indeed, FAA regulations plainly invited Penobscot to
submit all such supporting documentation. See 14 C.F.R.
 16.23(b)(3), (g), (i); 16.29(b)(1). Thus, the FAA's procedure
was not ex parte; all parties were permitted to participate,
although not in an adversary setting. 
 The third and final Eldridge consideration is the "fiscal
and administrative burdens" that would be entailed if we were to
require an evidentiary hearing in cases such as this. Eldridge,
424 U.S. at 335. On the surface, at least, it appears that such a
requirement could amount to a not insignificant burden on the FAA
in allocating its resources among its various enforcement efforts.
If Penobscot's argument were accepted, the FAA would be required to
conduct trial-type hearings in connection with nearly every
complaint filed with it. This would require the agency to invest
its scarce resources in holding formal hearings on complaints that
its investigation shows did not involve any violations, at the
expense of other enforcement efforts to protect the public from
aviation hazards. The due process clause does not require such a
result.
 Penobscot speculates that "conducting evidentiary
hearings in airport cases involving important property or liberty
interests would result in more vigorous protection of these
interests." Thus, it argues, the FAA would face fewer complaints
in the long run by providing more process in the short run. The
contrary appears more likely: requiring formal evidentiary
hearings in all such cases would force the FAA to over-invest
procedurally in claims that might be assessed just as accurately
without an oral proceeding. Penobscot offers no support for its
long-run efficiency contention other than the "suggest[ion]" of its
"intuition." Nor does it offer any guidance as to what interests
are sufficiently "important" to require an evidentiary hearing. It
is enough for us here to conclude, after weighing all three
Eldridge factors, that the due process clause does not require such
a hearing in Penobscot's case.
 IV
 Penobscot's Claims on the Merits
 A. The Exclusive Right Claim Based on Disparate Rates
 Turning to the merits, the FAA did not act arbitrarily or
capriciously in dismissing Penobscot's formal complaint. First,
Penobscot argues that the FAA erred when it found that Knox County
did not violate the Act by granting Downeast Airlines an "exclusive
right" to the use of the airport. The "exclusive right" provision
of the Act provides that "[a] person does not have an exclusive
right to use an air navigation facility on which Government money
has been expended." 49 U.S.C. 40103(e) (1994). Because Knox
County has been the recipient of federal funds and property for its
airport through various federal aid programs, it is subject to the
federal prohibition against the grant of an exclusive right.
 The term "exclusive right" was "intended to describe a
power, privilege, or other right excluding or debarring another or
others from enjoying or exercising a like power, privilege, or
right." Pompano Beach, 774 F.2d at 1541 (quoting 40 Op. Att'y Gen.
71, 72 (1941)). "The type of exclusive right prohibited by [this
provision of the Act] has been described as one of the sort noxious
to the anti-trust laws." Id. at 1542 (internal quotation marks
omitted). 
 The FAA in the present case determined that Knox County
had not violated the "exclusive right" provision. Even though the
agency recognized that the rental rate charged to Penobscot was not
the same as that charged to Downeast, the FAA concluded that the
dissimilar lease payments did not rise to the level of a prohibited
grant of an exclusive right. Penobscot challenges the FAA's
conclusion, contending first that a differential in rental rate is
per se a violation, and, second, that the disparity here
constitutes the grant of an exclusive right. We first consider and
reject Penobscot's per se violation argument.
 The imposition of disparate rates for comparable premises
may (but need not) constitute a grant of an exclusive right. 
Penobscot points to a statement by the FAA itself that "[a]n
exclusive right may be conferred either by express agreement, by
imposition of unreasonable standards or requirements, or by any
other means." FAA Advisory Circular No. 150/5190-2A, at 3
(April 4, 1972); see also Pompano Beach, 774 F.2d at 1542. But the
word "may" is permissive, not mandatory, so, under this evidence,
an airport does not commit a per se violation of the "exclusive
right" prohibition by charging two different FBOs different lease
rates. Thus, the FAA does not regard this kind of disparity as a
mandatory violation, and its interpretation is entitled to
deference.
 Moreover, the FAA Circular speaks of "unreasonable
standards or requirements." This implies not only that de minimisdisparities would not constitute violations, but also that a
disparity must rise to some level of "unreasonableness" before it
may even be considered in the category of non-mandatory "exclusive
right" violations. See Pompano Beach, 774 F.2d at 1544 ("Key to
our affirmance [of the FAA] is the fact that the City's
contemporaneous treatment of the [two FBOs] differed so markedly." 
(Emphasis added.)). Such limitations are a permissible elaboration
of the statutory requirement, see 49 U.S.C. 47107(a)(1), (5), and
we defer to the FAA's interpretation. Thus, the mere fact that
lease payments are not identical does not necessarily constitute
"unjust discrimination" in prices or the grant of an "exclusive
right."
 Having rejected Penobscot's per se violation argument, we
turn to the facts of the present case. There was no dispute that
the rental rates Knox County charged to Penobscot and Downeast were
not identical. But on the record before the agency, the FAA
determined that these disparate rates did not create an "exclusive
right" for any tenant under 49 U.S.C. 40103(e). The FAA reasoned
that Downeast had negotiated its lease seven years earlier than
Penobscot, and the circumstances were very different. For seven
years, Downeast was the only FBO at the airport, and its
"percentage rental rate was intentionally set low by the County to
encourage Downeast to service the airport and provide air service." 
The FAA concluded that Knox County's setting a different rate for
Penobscot was consistent with applicable agency guidelines and not
in violation of the statute. The FAA's findings of fact on this
issue were not seriously contested by Penobscot, and they are in
any event amply supported by substantial evidence on the record as
a whole. Nor was the FAA's determination arbitrary or capricious
or otherwise "not in accordance with law." See 5 U.S.C.
 706(2)(A).
 Moreover, Penobscot offered no evidence demonstrating
that the premises leased by Penobscot and Downeast were
comparable. For this reason, Penobscot cannot even establish, as
a factual matter, that Knox County charged disparate rental rates
for similarly situated premises. Therefore we need not even get to
the question whether any disparity is sufficiently great as to
amount to the grant of an "exclusive right." But even if we did,
we note that Penobscot has not even addressed the question of
whether the difference between a 2.5% rental rate (which Penobscot
was charged for its first five years) and a 1.5% rate (which
Downeast was charged for its first five years) is large enough to
constitute an "unreasonable" or non-de minimis disparity.
 Nor may Penobscot rely on Pompano Beach to buttress its
assertion of an "exclusive right" violation. As the FAA concluded,
Pompano Beach is distinguishable because "[t]here is no evidence to
demonstrate that Knox County has taken action to prevent
[Penobscot] from providing any aeronautical service that it is
permitted to provide under its lease or that [Penobscot] was ever
denied access to the airport, as was the off-airport applicant in
Pompano Beach." See Pompano Beach, 774 F.2d at 1541-45. We note,
too, that the Pompano Beach court upheld the FAA's determinationthat the disparate treatment was "unjustly discriminatory,"
concluding that the FAA was "entitled to [so] find." Id. at 1543. 
The court did not reverse the FAA's determination that a disparity
was not unjustly discriminatory, as Penobscot asks us to do here.
 Because of the differences in circumstances between
Penobscot and Downeast, the FAA concluded that the rental rate
differential did not constitute the grant of "an exclusive right"
to Downeast, nor was it unjustly discriminatory. The FAA's
determination is neither "arbitrary or capricious" nor otherwise
"not in accordance with law."
 As an alternative justification for its Final Decision,
the FAA points out that "[i]n the context of fees and charges, the
FAA will not ordinarily consider a complaint of unjust
discrimination brought by a complainant that agreed to the fees
through a lease." Penobscot ignores the fact that it negotiated
its lease with Knox County and voluntarily agreed to the fees
charged. Indeed, Penobscot renegotiated the lease just ten months
before it filed its formal complaint here: it proposed an
amendment to the lease terms to address the alleged burden caused
by the disparate treatment, and Knox County agreed to that
modification. As the FAA put it, Penobscot's "agreement to these
new lease terms would itself be sufficient basis under applicable
FAA policy to support a finding that the dissimilar lease terms
were not unjustly discriminatory and, therefore, did not create a
prohibited exclusive right." We agree. 
 A commercial enterprise like Penobscot cannot negotiate
a rental agreement that requires a particular payment rate and
schedule, commence doing business and earning profits under that
agreement, and then when a balloon payment comes due, complain that
the deal was unfair at its inception. In the FAA's words: "the
purpose of the grant assurances is to protect the public interest
in the operation of Federally obligated airports. The purpose is
not to provide alternative or supplemental rights to those normally
available to commercial tenants in disputes with their landlords,
i.e., negotiation or commercial litigation under applicable state
and local laws." We agree with the FAA that Congress did not
intend "grant assurances and the FAA compliance process to provide
a device by which a commercial aeronautical tenant can abrogate an
otherwise valid commercial lease with a sponsor because the
operations under the lease are less profitable than the tenant
anticipated."
 B. The "Minimum Standards" Claim
 The FAA also dismissed Penobscot's second substantive
contention: that the airport provided an exclusive right to a
second Penobscot competitor, Barnstorm Aviation, by relieving it of
the obligation to comply with minimum standards. The FAA found
insufficient evidence to support this allegation. 
 1
 The FAA argues that we have no jurisdiction to consider
this claim because Penobscot lacks standing under Article III of
the Constitution to raise these claims. We disagree. The FAA is
correct, of course, that Article III's standing requirements are
jurisdictional. See Steel Co. v. Citizens for a Better Env't, 118
S. Ct. 1003, 1012-16 (1998). Those requirements are three-fold: 
(1) the plaintiff must have suffered, or be threatened with, an
actual injury, (2) traceable to the defendant, and (3) likely to be
redressed by a favorable judicial decision. See Lujan v. Defenders
of Wildlife, 504 U.S. 555, 560 (1992); Dubois, 102 F.3d at 1281.
 The FAA asseverates that Penobscot fails to meet the
injury-in-fact requirement because it "has not demonstrated (and
cannot, because it's operating at the airport) that [Penobscot] or
any other operator has been excluded from the airport because
Barnstorm Aviation has been permitted to perform maintenance
services without meeting Knox County's minimum standards." Thus,
according to the FAA, Penobscot "has suffered no concrete injury by
virtue of the FAA's decision regarding Knox County's alleged
failure to enforce the 'minimum standards' against various other
operators (or by virtue of Knox County's alleged inaction itself)." 
But the fact that Penobscot is "operating at the airport" and thus
has not "been excluded" totally does not mean that it has not
suffered any "concrete injury." If Penobscot's costs are higher 
than those of its competitors because it has to comply with
certain standards that the competitors do not then its higher
costs constitute a concrete injury. See Clinton v. City of New
York, 118 S. Ct. 2091, 2100 (1998), citing 3 K. Davis & R. Pierce, 
Administrative Law Treatise 13-14 (3d ed. 1994).
 The FAA also fleetingly argues that it is not clear how
the FAA has caused Penobscot's alleged injury, or how a decision in
Penobscot's favor would be likely to redress that injury. But
again, if Penobscot's higher costs constitute a concrete injury,
and the FAA has refused to enforce Penobscot's asserted right to
have its competitors subjected to the same minimum standards to
which Penobscot is subjected, then the FAA has been, to a
sufficient extent, a factor causing the injury. And a favorable
outcome in this litigation would redress that injury, at least to
a degree sufficient for Penobscot to have standing under Article
III. Indeed, the "causation" factor and the redressability factor
are no less applicable to Penobscot's "minimum standards" complaint
than they are to its "exclusive right" complaint, and the FAA
concedes that Penobscot has standing to raise that issue.
 2
 We may easily dispose of the merits of the "minimum
standards" claim. Penobscot alleges that Knox County permitted
Barnstorm Aviation to perform commercial aircraft maintenance
without a lease and without complying with Knox County's minimum
standards, whereas Penobscot was required to comply with all
minimum standards. Penobscot states this allegation in conclusory
terms, and failed to supply the agency either with specifics or
with evidence to support its claim. Therefore the FAA dismissed
Penobscot's claim on the ground that it was "unsubstantiated and
without supportive documentation to warrant further investigation." 
That decision was not arbitrary or capricious. 
 Penobscot asserts that Knox County admitted that it had
permitted Barnstorm to perform aircraft maintenance services
without obtaining an airport lease. For this reason, it argues
that the FAA cannot dismiss Penobscot's claim on the sole ground
that Penobscot "did not explain how the County violated its minimum
standards." Penobscot's argument is unavailing. The lack of
explanation was not the "sole ground" of the FAA's decision but
rather was an alternative ground. The FAA rejected Penobscot's
assertion that Knox County had admitted the allegation, observing
that "[t]he County's express denial of [Penobscot's] one sentence
allegation put the matter at issue, and [Penobscot] did not address
it with argument or evidence in its reply." Although Penobscot
deemed it unnecessary to "explain how the County violated its
minimum standards," the agency thought more details were required. 
As we will explain, we agree. 
 The FAA further asserts that Penobscot's allegation is
irrelevant, because Penobscot "has not demonstrated (and cannot,
because it's operating at the airport) that [Penobscot] or any
other operator has been excluded from the airport because Barnstorm
Aviation has been permitted to perform maintenance services without
meeting Knox County's minimum standards." Penobscot takes issue
with the FAA's reasoning, contending, correctly, that a complete
denial of access to the airport is not required in order to make
out a claim that an exclusive right has been granted. As noted
supra, Penobscot is correct that courts have found the grant of an
exclusive right where a significant burden has been placed on one
competitor that is not placed on another.
 But Penobscot's reasoning is flawed. It suggests that
the FAA had no choice but to pursue its complaint because Knox
County did not strictly enforce 100% compliance with all of its
minimum standards in every instance. Penobscot had some obligation
to flesh out the details of the alleged minimum standards
violations and to demonstrate the extent to which those violations
impeded its ability to compete on an equal footing at the airport,
even if the violations did not completely deny Penobscot access to
the airport. This obligation became particularly important when
the FAA the law enforcement agency which Penobscot was urging to
pursue enforcement action asked for additional specifics
regarding Penobscot's charges, after Knox County stated that it did
not permit Barnstorm to violate its minimum standards, that it did
its best to prevent any violations, and that for the most part it
succeeded. Penobscot utterly failed to meet its burden in this
regard, and we find that the FAA acted well within its
prosecutorial discretion in declining to pursue Penobscot's
complaint any further. Its decision was not arbitrary or
capricious.
 Conclusion
 Penobscot has no right under the statute or the
regulations to an evidentiary hearing on its formal complaint, and
the FAA did not abuse its discretion in denying such a hearing on
these facts. If applicable, the due process clause entitled
Penobscot to no more process than that provided through the FAA's
formal complaint procedure followed by the FAA's investigation in
this case. Finally, the FAA's dismissal of Penobscot's complaint
was grounded on substantial evidence in the record, was not
arbitrary or capricious, and did not rest on any errors of law. 
 Accordingly, we AFFIRM the decision of the FAA. Costs on
appeal awarded to the FAA.